Rhoades *v.* Abington Township School District.
Worrell *v.* Matters.

Argued April 27, 1966. Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

*Victor J. Roberts,* with him *Walton Coates,* and
*High, Swartz, Roberts & Seidel,* for plaintiffs, Brenard
G. Rhoades and others.

*William P. Thorn,* with him *Leo Pfeffer,* specially admitted for argument, and *Thorn, McConemy & Ohrenstein,* and *Richard, Brian & Disanti,* for plaintiff, Betty J. Worrell.

*Percival R. Rieder,* for defendant, Abington Township School District.

*George W. Thompson,* for defendant, George W. Matters.

*D. Barry Gibbons,* and *Reed and Gibbons,* for intervening defendants, Paul A. Grubb and others.

*Walter E. Alessandroni,* Attorney General, with him *Edward Friedman, John P. McCord* and *David S. Dickey,* Deputy Attorneys General, for Commonwealth, intervenor.

*William B. Ball,* for intervenors, Thomas J. Paul and others.

*David Berger, Harold Greenberg, Edward B. Soken,* and *Cohen, Shapiro, Berger & Cohen,* for School District of Philadelphia, intervenor.

*Walter W. Rabin, W. Joseph Harrison, III, Raymond Jenkins* and *Norman R. Bradley,* for intervenors, Robert S. Eininger and others.

*John D. Killian,* for Friends of the Public Schools and Pennsylvania Council of Churches, amici curiae.

*William D. Valente* and *Paul W. Bruton,* for Pennsylvania Federation, Citizens for Educational Freedom, amicus curiae.

*Gilbert Yaros,* for Pennsylvania Chapter of the National Jewish Commission on Law and Public Affairs, amicus curiae.

Opinion by Mr. Justice Musmanno, January 17, 1967:

The Act of June 15, 1965,[1] amending §1361 of the Public School Code of 1949,[2] provides, inter alia: "When provision is made by a board of school directors for the transportation of resident pupils to and from the public schools, the board of school directors shall also make provision for the free transportation of pupils who regularly attend nonpublic elementary and high schools not operated for profit."

On August 30, 1965, Brenard G. Rhoades and five others filed a suit in equity in Montgomery County, averring that the Act of June 15, 1965, known as Act No. 91, was unconstitutional, unlawful and invalid, and asking that the court enjoin the defendant School District of Abington Township from entering into any contract under the indicated legislation.

On September 1, 1965, Betty J. Worrell filed a similar suit in Delaware County against the school directors and officers of Rose Tree Union School District. The Attorney General of the Commonwealth petitioned this Court to take original jurisdiction in the two equity actions and we issued certiorari to bring the actions before us for disposition. The Attorney General intervened in both actions, so did other parties, all of whom filed answers and briefs. All counsel participating in the argument, both orally and by printed brief, have presented their positions ably and vigorously.

The issue is one on which adversaries feel deeply, although in reality the opposing points of view do not bristle with as much contention as might at first appearance seem likely. The plaintiffs [3] and those who

---

[1] Act No. 91, P. L. 133, 24 P.S. §13-1361.

[2] Act of March 10, 1949, P. L. 30, 24 P.S. §13-1361.

[3] To avoid a cumbersome distinction, wholly unnecessary in the discussion, between the suit filed in Montgomery County and the

support their position see in Act 91 an infringement on the First Amendment to the Federal Constitution and to Article I, §3; Article III, §§17 and 18; and Article X, §§1 and 2 of the Pennsylvania Constitution.

The purpose of Act 91, as announced in its title, is to provide for the "health, wealth and safety of the children of the Commonwealth," The phrase "health, wealth and safety" is not to be treated lightly or as a superfluity. "The Legislature cannot be deemed to intend that its language be superfluous and without import." (*Daly v. Hemphill*, 411 Pa. 263.)

The larger number of schools in Pennsylvania are located so far away from the homes of the pupils who attend them that the pupils are required either to walk long distances or to make use of vehicular transportation. In recent years the foot traveler, because of the volume of motor traffic which more and more is approaching the grim appearance of a foreign invasion, is in constant jeopardy of death or physical disablement, as he proceeds, warily or carefree over the highways of the nation. And those who ride in private cars can never be certain, because of the ever-increasing violence and number of collisions, that they will arrive at their destinations with only the ailments they enjoyed when they started on their journeys.

Testimony before a United States Senate Committee advanced the dire prediction that: "It seems probable that over the next 5 years we will kill on the highways of this country as many people as we lost to enemy action in all four years in World War II. In the next decade, we can expect to kill more than 500,000 people and injure about 40 million." (89th Cong. 2d Sess. 112 Cong. Rec. 6576.)

In view of the peril hovering over our streets and roads like a miasmatic fog, those charged with concern

---

one filed in Delaware County, the parties arguing for the unconstitutionality of Act 91 will be called in the opinion, the plaintiffs.

for the safety of children are duty bound to devise methods and means for saving the little travelers from harm on their way to and from school. Obviously the manner in which to provide these youthful wayfarers with a fair measure of protection against highway mishap is to keep them pedally off the roads and to transport them in vehicles so formidably constructed that they may ward off and parry, to the maximum extent possible, aggression from other vehicles. The school bus with its large heavy wheels and steel fabricated body seems to be the answer to the worrisome problem. Pennsylvania Secretary of Public Welfare, in testifying on House Bill 381 (later to become Act 91) before the Senate Education Committee, said: ". . . school bus transportation clearly involves the safety and health of our children. The busing of school children is for their protection against hazards of the roadways and of traffic, against dangers occasioned by exposure to weather, against evils of child molestation." [4]

He stated further that "with respect to injuries," a person is five times as safe in a school bus as in a car. "With respect to death," a person is ten times as safe in a school bus as in a car. In support of this statement, he cited statistics: "In 1963, there were 2.3 deaths per 100,000,000 miles, in cars, as compared to .2 deaths, per 100,000,000 miles in school buses."

The need for the collective motorized transportation of school children is thus as apparent as a washed-away bridge. The opponents of Act 91 do not contest the desirability, indeed even the imperativeness, of transporting children to school by means of school buses, but argue that they may not be used to ferry children attending nonpublic schools which, of course, include parochial schools. They point to the First

---

[4] Hearings before Senate Education Committee 14-16 (March 24, 1965).

Amendment to the Constitution of the United States which declares, inter alia, "Congress shall make no law respecting an establishment of religion," [5] and argue that Act 91 offends against it.

Despite the wondrous flexibility of the English language it is still difficult to see how one can conclude that, placing children on a school bus establishes a religion. And even if the children are transported to a school which, in addition to teaching state-approved subjects, offers guidance in the world of faith, this still does not establish a religion. Our whole body of school law is predicated on the proposition that once children are served educationally according to State criteria, their extracurricular activities cannot adversely affect the State, constitutionally. Indeed, the Public School Code specifically embraces the concept of nonpublic schools, the title explaining that the law relates to "the public school system, including certain provisions applicable as well to private and parochial schools."

In his concurring opinion in the case of *McGowan v. Maryland,* 366 U.S. 420, 467, Justice FRANKFURTER said: "It was on the reasoning that parents are also at liberty to send their children to parochial schools which meet the reasonable educational standards of the State . . ., that this Court held in the Everson case that expenditure of public funds to assure that children attending every kind of school enjoy the relative security of buses, rather than being left to walk or hitchhike, is not an unconstitutional 'establishment', even though such expenditure may cause some children to go to parochial schools who would not otherwise have gone."

---

[5] The Supreme Court of the United States has held that the First Amendment has been made wholly applicable to all the States by the Fourteenth Amendment. (*School District of Abington Township v. Schempp*, 374 U.S. 203).

Pennsylvania State laws compel all children up to 18 years of age to attend school—not public school, but *any* school so long as it teaches an approved curriculum and meets other State requirements. The State awards to nonpublic school students the same scholastic credits as those which are earned by public school students. It would be grossly illogical, therefore, to say that the State which does not differentiate between public and nonpublic pupils, so far as grades, promotion, and graduation are concerned, cleaves a line of distinction between them according to whether they arrive at the school on school buses, in private motor cars or on foot.

Not only do law and reason refute any such differentiation, but economics in good government dispels the concept. The huge budgets required to maintain our public school system is a matter of concern to everybody. The imperative need for the best in education for the youth of our Commonwealth convinces the civic-minded citizens of the inevitability of heavy taxes to meet the expense, but it does not lessen the weight of the financial burden he must carry. Therefore, any procedure which may lighten that burden, consistent with maintaining the highest State educational standards, is warmly welcomed by the taxpayers. Thus, for every nonpublic school pupil picked up on the road by a public school bus, that much weight is lifted from the back of the taxpayer because the maintenance of nonpublic schools, of course, does not depend upon public funds.

Nearly one-fourth of the school children in Pennsylvania attend nonpublic (mostly denominational) schools. Since the parents of the children in nonpublic schools still pay public school taxes, without using public school facilities, it has been estimated that the taxpayers, since they are not required to provide teachers, equipment and supplies for the nonpublic school chil-

dren, are financially benefited to an amount equal to one-third of the entire educational budget of the Commonweath.[6] Indeed, if nonpublic schools were to be abolished, the increase in tax burden to the citizens of the Commonwealth would be noteworthy and the Commonwealth would be hard put to provide the buildings, teachers and equipment for the flood of additional children released into their care and responsibility.

Where children are involved, the laws of the Commonwealth and the decisions of our Courts make no distinction between public school and nonpublic school pupils. In 1911 the Pennsylvania Legislature enacted a law [7] providing for the establishment of manual training schools for all children, public and nonpublic. It specifically stated that "no pupil shall be refused admission to the courses in these additional schools or departments, by reason of the fact that his elementary or academic education is being or has been received in a school other than a public school." When a 13-year-old pupil of a private school endeavored to obtain this manual training, taught in a public school in Altoona, the school district involved refused him admittance, arguing that the Act was unconstitutional in that it would give "to private and sectarian schools the use of moneys raised for the public schools, contrary to Article IX, §7, and Article X, §2, of the Constitution." The Act specifically stated that the manual training school was to be "an integral part of the public school system in such school district." Despite this language which

---

[6] General Fund Budget Message of Governor William W. Scranton, February 7, 1966 (b) 1966-1967 BUDGET OF THE COMMONWEALTH OF PENNSYLVANIA (c) "Current Expenditure Per Pupil, Average Daily Membership for Selected States", 1965-1966, Table 17, p. 20, Vol. 4, SELECTED EDUCATIONAL STATISTICS, Bureau of Statistics, Department of Public Instruction, Commonwealth of Pennsylvania (1966).

[7] Section 401, Act of May 18, 1911, P. L. 309.

went much further in linking public and private schools in an educational undertaking than Act 91 here being discussed, our Court held that the Act was constitutional, stating: "The benefits and advantages of these additional schools and means of education and improvement are not restricted to the pupils in regular attendance at the elementary public schools and pursuing the entire prescribed elementary courses, but are intended to be free to all 'persons residing in such district'. . ." (*Comm. v. School District of Altoona*, 241 Pa. 224.)

If the pupil of a private school may attend a manual training school, which by law has become part of the "public school system", certainly he may not under the present law, be excluded from a bus which in itself, stationary or mobile, is not a classroom for instruction.

The Public School Code provides for children, without distinguishing between public and nonpublic schools, many facilities, as, for instance, medical, dental and nurse services (§14-1401 et seq.); driver safety (§15-1519); food and milk supply (§13-1335); board and lodging (§13-1367), tuition and maintenance of blind, deaf and cerebral palsied children (§13-1376). The Public School Code provides that school district funds may be used for traffic safety purposes: "The board of directors of any school district acting alone or with another district or districts, may contribute funds to another political subdivision for the erection and maintenance of stop and go signal lights, blinkers or other like traffic control devices." (1949, March 10, P. L. 30, §526, added 1965, Dec. 1, P. L. 1002, §1, 24 P.S. §5-526).

On the basis of logic and sustained reasoning it would be absurd to allow nonpublic school children into all these public services but deny them a ride on a bus to attend a school conforming to the requirements of the State educational program.

But the plaintiffs in the Montgomery County case argue that Act 91 is unconstitutional because five of the schools that educate children riding the school buses are owned and operated by the Roman Catholic Church and that, therefore, the plaintiffs contend, "a primary and direct effect of the expenditures necessary or reasonably attendant upon such maintenance and operation is to advance the Roman Catholic Church, the particular local Roman Catholic Churches, and the religion thereof."

This same argument was pressed in the case of *Everson v. Board of Education*, 330 U.S. 1, where the constitutionality of a New Jersey statute was attacked because it authorized reimbursement to parents for fares paid for transporting by public carrier children attending public and Catholic schools. The Supreme Court of the United States ruled that the statute did not offend against the Federal Constitution: ". . . we cannot say that the First Amendment prohibits New Jersey from spending tax-raised funds to pay the bus fares of parochial school pupils as a part of a general program under which it pays the fares of pupils attending public *and other schools*. It is undoubtedly true that children are helped to get to church schools. There is even a possibility that some of the children might not be sent to the church schools if the parents were compelled to pay their children's bus fares out of their own pockets when transportation to a public school would have been paid for by the State. The same possibility exists where the state requires a local transit company to provide reduced fares to school children including those attending parochial schools, or where a municipally owned transportation system undertakes to carry all school children free of charge. Moreover, state-paid policemen, detailed to protect children going to and from church schools from the very real hazards of traffic, would serve much the same

purpose and accomplish much the same result as state provisions intended to guarantee free transportation of a kind which the state deems to be best for the school children's welfare. And parents might refuse to risk their children to the serious danger of traffic accidents going to and from parochial schools, the approaches to which were not protected by policemen. Similarly, parents might be reluctant to permit their children to attend schools which the state had cut off from such general government services as ordinary police and fire protection, connections for sewage disposal, public highways and sidewalks. Of course, cutting off church schools from these services, so separate and so indisputably marked off from the religious function, would make it far more difficult for the schools to operate. But such is obviously not the purpose of the First Amendment." (Emphasis supplied.)

The United States Supreme Court found that the parochial schools there under consideration met New Jersey's school requirements. The State contributed no money to these schools; it did not support them. The legislation which provided for the busing of the parochial children did "no more than provide a general program to help parents get their children, regardless of their religion, safely and expeditiously to and from accredited schools." Therefore, the law was not at odds with the First Amendment. The same is true of Pennsylvania's Act 91. In its discussion the Supreme Court referred to the case of *Pierce v. Society of Sisters,* 268 U.S. 510. There, the State of Oregon had passed a law requiring parents, under penalty of punishment for disobedience, to send their children to public schools. The Supreme Court held that such a law constituted an unreasonable interference with the liberty of parents and so violated the Fourteenth Amendment. The Court said: "The child is not the mere creature of the State; those who nurture him and direct

his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." (p. 535)

Commenting on the *Pierce* case, the Supreme Court said in the *Everson* case: "Parents may, in the discharge of their duty under state compulsory education laws, send their children to a religious rather than a public school if the school meets the secular educational requirements which the state has power to impose." (p. 18)

The Supreme Court also pointed out that the First Amendment, in addition to abjuring the establishment of religion, also declared that there must be no prohibition in the "free exercise" of religion. Thus, while government may not use a legislative tool to build a church, neither may it employ a parliamentary bulldozer to demolish a church already constructed. "State power is no more to be used so as to handicap religions than it is to favor them." (Everson, supra, p. 18)

Religion is part of the American way of life. Beginning with the landing of Columbus on the shores of San Salvador when the Genoese navigator offered prayers of gratitude to God for the faith which sustained him in the preparation for, and the perilous achievement of, his hazard-laden voyage, continuing through the Mayflower Compact which is headed by the solemn and sacred words: "In the name of God Amen!" and calls upon the Deity for guidance and support in the new life to begin on the American continent, carrying on through the Declaration of Independence and the Constitution of the United States in their reverent supplication to a Supreme Being, and standing fast in State papers and the pronouncements of our Presidents, religion is inseparable from the history of the United States. The United States Supreme Court said in the case of *Abington School District v. Schempp*, 374 U.S. 203, 213: ". . . This background is

evidenced today in our public life through the continuance in our oaths of office from the Presidency to the Alderman of the final supplication, 'So help me God.' Likewise each House of the Congress provides through its Chaplain an opening prayer, and the sessions of this Court are declared open by the crier in a short ceremony, the final phrase of which invokes the grace of God. Again, there are such manifestations in our military forces, where those of our citizens who are under the restrictions of military service wish to engage in voluntary worship. Indeed, only last year an official survey of the country indicated that 64% of our people have church membership. Bureau of Census, U. S. Department of Commerce, Statistical Abstract of the United States (83d ed. 1962) 48, while less than 3% profess no religion whatever. Id., at p. 46. It can be truly said, therefore, that today, as in the beginning, our national life reflects a religious people who, in the words of Madison, are 'earnestly praying, as . . . in duty bound, that the Supreme Lawgiver of the Universe . . . guide them into every measure which may be worthy of his [blessings. . . .].' "

Even Justice RUTLEDGE, writing the dissent in the *Everson* case, acknowledged that: "Our constitutional policy . . . does not deny the value or the necessity for religious training, teaching or observance. Rather it secures their free exercise." (p. 52)

Every daily session of the courts of this Commonwealth open with the adjuration: "God save the Commonwealth and this Honorable Court." Each witness who takes an oath in all our Courts is required to avow that he will tell the truth, the whole truth, and nothing but the truth, for which he will answer "on the last Great Day." At patriotic ceremonies where the national anthem is sung, the citizens lift their voices to the words: "This be our motto 'In God Is Our Trust.' "

The Pledge of Allegience to the Flag of the United States proclaims "One Nation under God."

The constitutional prohibition against the establishment of religion was never intended to deny the free exercise of religion. Thomas Jefferson, who penned the Declaration of Independence, and who also wrote Virginia's Bill for Religious Liberty, proclaimed the omnipotence of the Author of the Universe: "Almighty God hath created the mind free; that all attempts to influence it by temporal punishments or burthens, or by civil incapacitations, tend only to beget habits of hypocrisy and meanness, and are a departure from the plan of the Holy author of our religion, who being Lord both of body and mind, yet chose not to propagate it by coercions on either. . ."

Any interpretation of legislation, therefore, which would deny the fullest voluntary freedom in religious worship would not only be contrary to these American historical expressions of faith, but would also offend against the First Amendment with its bell-clanging proclamation of religious freedom. It was because the Founding Fathers foresaw the possibility of forces and influences working to destroy the faith of man in a Supreme Being that they made the free exercise of religion part of the same swing of the pendulum which prohibits the establishment of a State religion.

In *Zorach v. Clauson*, 343 U.S. 306, the Supreme Court said: "The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State. Rather, it studiously defines the manner, the specific ways, in which there shall be no concert or union or dependency one on the other. . . We are a religious people whose institutions presuppose a Supreme Being. We guarantee the freedom to worship as one chooses. We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary . . . we find no constitu-

tional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence."

From this same pulpit of American historical exposition, the Supreme Court declared in *Everson*: ". . . New Jersey cannot hamper its citizens in the free exercise of their own religion. Consequently, it cannot exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, because of their faith, or lack of it, from receiving the benefits of public welfare legislation."

Act 91 is public welfare legislation and, from the reservoir of public welfare, all races and religions may drink unimpededly in the quenching of normal thirsts. Indeed one of the fundamental reasons for the State in a civilized society is to provide for the public welfare.

The *Everson* case is the law of the land and rules squarely against the contentions of the plaintiffs in the Courts below in so far as the Federal Constitution is concerned. Our own Court upheld the *Everson* case by name in 1956 in *Schade v. Allegheny County Institution District*, 386 Pa. 507. In that case an attempt was made to declare unconstitutional the Juvenile Court Law of Allegheny County of June 3, 1933, P. L. 1449, and the County Institution District Law of June 24, 1937, P. L. 2017 because they provided for the payment of tax revenues raised by Allegheny County to denominational or sectarian institutions or homes for the board, care and maintenance of neglected or dependent children on order of Allegheny County's Juvenile Court. The complaining plaintiffs argued that these laws violated the Pennsylvania Constitution which prohibits appropriations "to any denominational or sectarian institution, corporation or association." This Court rejected the contention of the plaintiffs that the payments to the denominational or sectarian defend-

ants tended toward "governmental 'establishment of religion', and, consequently are violative of the Fourteenth Amendment." Mr. Justice JONES, speaking for our unanimous Court, said: "It is unnecessary to devote much time to this contention. The Supreme Court has, in principle, settled it adversely to the appellant's position. See Everson v. Board of Education, supra, where it was held that a State's use of public tax funds for the transportation of pupils to and from sectarian schools did not serve to promote the establishment of religion."

We here hold that Act 91 does not offend against the First or Fourteenth Amendments to the Constitution of the United States. Does it transgress any provision or provisions of the Constitution of Pennsylvania? We have already touched on certain phases of the State Constitution in connection with a discussion of alleged trespassing on the domains of the United States. We will now examine specifically the argument that Act 91 cannot survive under prohibitory provisions of our own State organic law.

The plaintiffs contend that Act 91 violates Art. 1, §3 of the State Constitution: "All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience, and no preference shall ever be given by law to any religious establishments or modes of worship."

The Abington Township brief asserts precisely that Act 91 "compels all the real property owners of the Township to support places of worship and to maintain a particular religious ministry against their con-

sent; and (2) it gives preference by law to certain religious establishments and modes of worship."

These assertions are so feeble of merit that they must fall in the slightest breeze of analysis. When the Constitution of 1874 was being debated in convention, no reference was made to the subject of pupil transportation. Supporting a place of worship meant providing funds for the maintenance of a church. The phrase certainly could not have referred to motor transportation. The concept of a horseless buggy was as unimaginable in 1873, as walking on air 150 miles above the earth was inconceivable in 1946. The first automobile to awe human beings, excite communities and startle animals did not honk a horn or turn a wheel until 1892. Thus, it can be stated with historic conclusiveness that the framers of the 1874 Constitution could not have had in mind a prohibition against motor transportation for children when they declared that no citizen of the State should be required to support a place of worship.

Even in quixotic imagination, a school bus cannot be regarded a place of worship. The general gayety, levity and juvenile frivolity which prevails among children riding any transportational vehicle rules out the solemnity of a place of worship. Nor can transporting a child to a church-connected school be regarded as supporting a place of worship. The purpose of the school bus is to take children to a structure where they will receive a secular education. Thus the bus serves a secular, public purpose, and as stated in *Everson,* "it is much too late to argue that legislation intended to facilitate the opportunity of children to get a secular education serves no public purpose."

The fact that the parochial pupil, in addition to receiving a secular education, is offered religious guidance, cannot take away the public nature of the curriculum he studies—a curriculum drafted and super-

vised by the State. The Supreme Court explained in *Everson* that it does not "follow that a law has a private rather than a public purpose because it provides that tax-raised funds will be paid to reimburse individuals on account of money spent by them in a way which furthers a public program."

The plaintiffs' assertion that Act 91 "gives preference by law to certain religious establishments and modes of worship" is self-defeating on its face because there is nothing in the Act which speaks of preference for nonpublic schools. Indeed the Act states that the buses on which the nonpublic school pupil may ride "shall be over established public school bus routes." Thus, while nonpublic students eventually reach the nonpublic school, there is no provision that the bus is to take them to the doorstep of that school, or that the bus will pick them up at their homes. So far as nonpublic school children are concerned, they must, in a universal Mohammed sense, go to the buses rather than that the buses come to them.

It is also to be noted particularly that Act 91 makes no special provision for parochial schools. It applies all-sweepingly to children attending nonpublic schools, whether those schools have an association with a church or not. In addition, it is significant that the nonpublic schools will not be the donee of funds or busing facilities, nor will they have any control over them.

The plaintiffs do not charge that nonpublic schools would, under Act 91, be the recipient of financial benefits. But even if this were to be an indirect result of the legislation, this fact in itself would not unconstitutionalize the law. In order to come within the constitutional ban, financial benefits accruing to a nonpublic school would have to be direct and not merely incidental, supplemental or peripheral. In *Hysong v. Gallitzin Borough School District,* 164 Pa. 629, the complaining party sought to enjoin a school district from

employing as teachers members of a religious order who contributed all their earnings, above their maintenance, to the religious order of which they were members. This Court rejected the complaint stating through the scholarly Justice DEAN, that: "It is none of our business, nor that of these appellants, to inquire into this matter. American men and women, of sound mind and twenty-one years of age, can make such disposition of their surplus earnings as suits their own notions. We might as well, so far as any law warranted it, inquire of a lawyer, before admitting him to the bar, what he intended to do with his surplus fees, and make his answer a test of admission. What he did with his money could in no way affect his right to be sworn as an officer of this court, therefore it would be impertinence in us to inquire."

The plaintiffs find in Act 91 a violation of Article III, §18 of the Pennsylvania Constitution, which reads, inter alia: "No appropriations shall be made for charitable, educational or benevolent purposes to any person or community nor to any denominational or sectarian institution, corporation or association."

In *Schade v. Allegheny County Inst. District*, supra, we affirmed the statement of the Court of Common Pleas of Allegheny County that: " 'The cost of the maintenance of neglected children either by the State or the County is neither a charity nor a benevolence, but a governmental duty.' " Educating the children of the state is a governmental duty, and if excessive distance builds a wall around the place of education, government must level that wall.

Moreover, Act 91 does not require any appropriation from the Commonwealth. In fact, the Abington Township School District admits this in its brief: "The draftsmen of the Act No. 91 of June 15, 1965, drew it so that the appropriations are and will be made not by the General Assembly, but by instrumentalities thereof

(school boards). Further, the Act is drawn so that no money passes directly from the state or from its instrumentalities into the treasury of any sectarian institution."

Although Abington cites the *Schade v. Allegheny County Inst. District,* supra, in support of its contentions, we have seen that it is a sword against those contentions rather than a shield for it. Our Court ruled that the payments made to the institution supporting neglected children is "in legal effect payments to the child." The school buses under Act 91 are operated for the benefit of the children who ride it and not for the benefit of the church which may be associated with the school in which the children receive a State-supervised education.

A public fire department is maintained by the taxes of the people, but no one would be so shortsighted as to argue that firemen had no duty to extinguish a conflagration which was consuming a church, no matter what the denomination. Policemen are assigned to duty at and about churches but no one would say that this is an illegal assignment of duty. Churches and religious establishments, regardless of creed, form part of the whole mosaic of our civilized society and should, and do, receive the protection of the State of their physical properties. " 'The Constitution does not prohibit the State or any of its agencies from doing business with denominational or sectarian institutions, nor from paying just debts to them when incurred at its direction or with its approval. Numerous cases can be readily visualized where such situations have occurred: i.e. payment of the bill of an injured employee to a sectarian hospital.' " (*Schade v. Allegheny County Inst. Dist.,* supra, p. 512).

The Abington brief cites Article 10, §1 of the State Constitution: "The General Assembly shall provide for the maintenance and support of a thorough and effi-

cient system of public schools, wherein all the children of this Commonwealth above the age of six years may be educated. . ." and argues that this destroys the constitutionality of Act 91. It does not even approach within firing range of Act 91. The constitutional provision in question mandates the Legislature to provide for the establishment "of a thorough and efficient system of public schools," but it does not say that there may not be schools supplemental to those supported by the State. If this constitutional provision prohibited the creation or existence of other schools, then every private school in the State would have to be dismantled, which, of course, would be absurd.

Section 2 of Article 10 states that: "No money raised for the support of the public schools of the Commonwealth shall be appropriated to or used for the support of any sectarian school." Abington sees in this section another bulldozer crushing out the life of Act 91, but Abington itself throws the bulldozer off its track with its own statement, namely, "one section of the Public School Code, viz., sec. 1401, relating to school health services, does extend to children in private schools and results in public expenditures for the benefit of all children of school age, whether they attend public or private schools. Of course, the health of all children residing within the Commonwealth is a matter of legitimate concern of the General Assembly. . . Programs such as health and dental examinations for all children of certain ages are unrelated to the 'support of any sectarian school.'" Indeed, under existing law, children in sectarian schools receive tax-supported health services. (Act of July 15, 1957, P. L. 937, as amended, September 29, 1961, P. L. 1743, 24 P.S. §25-2505.1.)

If the health of *all* children in the Commonwealth is a matter of legitimate concern of the General Assembly, why would not their safety also be a matter of

legitimate concern of the General Assembly? As already quoted, Arlin M. Adams, the Pennsylvania Secretary of Public Welfare, said: "The busing of school children is for their protection against hazards of the roadways and of traffic, against dangers occasioned by exposure to weather, against evils of child molestation."

If the General Assembly can act and appropriate to save children from the onslaughts of diptheria, smallpox and other infectious diseases, is it impotent to protect them from the pneumonia-provoking blasts of winter, the mangling fenders of a drunk-driven automobile, and the lecherous advances of the depraved molester on the highway?

We have seen that the bus transportation authorized by Act 91 must traverse routes which lead to public schools. Are parochial children on these routes to be left to the mercies of inclement weather, culpably negligent drivers and children disturbers? In not a few instances the school buses picking up only public school children travel with many empty seats. Is a nonpublic school child to be denied a seat in an unfilled bus, leaving him to plod the weary miles on foot? With such school buses on the road, expending no extra gasoline to pick up nonpublic school children, are they to return home and ask their parents for private transportation beyond their means to supply?

In all the briefs which have been filed in opposition to Act 91, there is not one statement or word remotely suggesting that the transportation of nonpublic school children will in the slightest be deleterious to the public, the individuals involved, or the educational program of the State. On the contrary, we have seen how this school busing will be protective of the health and the safety of the children. In addition, such busing will be salubrious and educational for the children in that public and nonpublic school children will mingle,

converse and soon learn that children are the same everywhere. These youthful riders, regardless of religious attachments, speak the same language, salute the same Flag, play the same games, laugh at the same jokes, entertain the same love for their respective parents, and demonstrate the same devotion to the ideals of our country. All this comes under the canopy of preserving the health, welfare and safety of the children, one of the most fundamental responsibilities of the State, and specifically provided for in the Public School Code of the State.

Paradoxically, the plaintiffs argue that Act 91 goes too far and then, that it does not go far enough. They complain that the statute does not provide for transportation of children who live close to their schools. But if the school is close enough to walk to, why must there be vehicular transportation? Sufficient to a trip is the distance thereof.

Then the plaintiffs say that students attending private schools for profit are omitted from the statute. In cases of private schools where education is imparted, on a profit basis, it can be assumed that if the parents or guardians can afford expensive special tutoring for their children, they can afford to provide private safe transportation for their children.

The brief filed in behalf of the plaintiff in the Delaware County case complains that "nonpublic school children who do not live near an established bus route will still face the same traffic hazards as they did before." The obvious answer here is that if these students are confronted with such dangers as will justify extending the scope of the Act, the General Assembly can provide for that extension, but it is no reasonable argument to say that because a statute does not make provision for a hypothetical minimal hazard, it should ignore a proved multiple peril.

This same brief argues that there is no analogy between bus transportation and the provision for lunches and medical care for nonpublic school children, specifying: "Lunch and medical care are things which a child must have, irrespective of whether or not he attends school." In our society it is accepted that food for the mind in the form of education is no less necessary than food for the stomach. With regard to medical care, the supplying of bus transportation may be the means of protecting children from illness-producing exposure which would lessen the need for medical care.

It was also argued before us that Act 91 will "accelerate the fragmentation of our society and increase religious conflicts." The exact reverse is true. The closer different religions get to one another, the less will be the reason for dissension. We can take judicial note of the fact that in recent years noble efforts have been made in establishing inter-faith councils, leading to the hope fulfillment of wiping away antagonisms between different churches and beliefs. Bringing children together in buses on their way to the temple of learning can only help to hasten the eventual attainment of the true brotherhood of man. The friendships made by children as they travel side by side and in conversational intimacy, to and from school and home, in the most formative years of their lives, will grow stronger with the passing of the years, increasing the mutual understanding which is the most potent welder in a common cause for peace and happiness.

Finally, the plaintiffs argue that Act 91 is unconstitutional because of "vagueness." The only thing vague in this entire situation is the charge of vagueness advanced by the plaintiffs. It is like a splash of rain that has no target and leaves no durable impression. A reading of Act 91 will reveal its stark simplicity, specificity and secularization. It has but one aim and that is to place nonpublic schools, in the matter of student transportation, in the same classification

as public schools, so long as the nonpublic schools observe the public school curricula. There is nothing in either the Federal or State constitution, the laws of the Commonwealth, or in fundamental justice to prohibit so salutary an objective.

The complaints in the courts below are dismissed, each party to pay own costs.

CONCURRING OPINION BY MR. JUSTICE JONES:

With the result reached by the majority of this Court I am in accord.

It is my opinion that the Act of June 15, 1965, P. L. 133, 24 P.S. §13-1361 (amending §1361 of the Public School Code of 1949, Act of March 10, 1949, P. L. 30, 24 P.S. §13-1361), which, "for the health, welfare and safety of the children of the Commonwealth", requires that school districts under certain circumstances provide free transportation for pupils attending nonpublic elementary and high schools not operated for profit, is valid legislation. The principal challenge to such legislation proceeds upon the theory that it is offensive to both the Constitution of the United States [1] and the Constitution of this Commonwealth.[2]

As to whether this statute violates the United States Constitution, the decision of the Supreme Court of the United States in *Everson v. Board of Education,* 330 U.S. 1, 67 S. Ct. 504 (1947), is controlling: *Everson* compels the conclusion that the instant statute does not violate the First Amendment. As to whether this statute violates the Constitution of this Commonwealth I am of the opinion that it does not.

In this Commonwealth, the parents and guardians of children are compelled by law to send such children, up to a certain age, to school. In *Pierce v. Society of*

---

[1] Specifically, the First Amendment.

[2] Specifically, Article I, §3, Article III, §18 and Article X, §2.

*Sisters,* 268 U.S. 510, 45 S. Ct. 571 (1925), the U. S. Supreme Court has ruled that, if a parochial school meets the secular educational requirements of the state, parents and guardians who send children to such parochial school satisfy the "compulsory education" mandate of the state.

The primary purpose of the instant statute is to insure the safety and the well-being of children, whose parents and guardians are compelled by law to send them to school, while such children are being transported to and from such school, whether the school be public or parochial. The statute constitutes an exercise of the police power of the Commonwealth; its emphasis is upon the welfare and safety of children while they are being transported to and from school and not upon the nature of the school to or from which they are being transported. Its aim is secular, not religious.

The framers of our Constitution contemplated that the church and the state be kept separate and apart and that the state maintain a status of impartiality and neutrality toward all religions and religious beliefs. The instant legislation "neither advances nor inhibits religion" in the constitutional sense (See: *School District of Abington Township, Pa. v. Schempp,* 374 U.S. 203, 83 S. Ct. 1560 (1963), but simply provides a method of safe transportation for children while performing the state-compelled duty of attending school.

In my view, neither the U. S. Constitution nor the Constitution of this Commonwealth prohibits or proscribes this statute so vital to the well-being of children pursuing their education.

---

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

The thrust of plaintiffs' attack on the Act of June 15, 1965, P. L. 133, 24 P.S. §13-1361 (hereinafter re-

ferred to as Act 91) is that it violates the separation of church and state mandated by the Constitution of the United States and that it violates various provisions of the Constitution of Pennsylvania. I concur with the view, shared by all but one member of this Court, that the *Everson* case forecloses this Court from holding that the statute violates the federal guarantee of separation. It is also my view that, even admitting that the statute will require the expenditure of additional funds for the busing of school children, Act 91 does not violate the Constitution of Pennsylvania.

In asserting their challenge to the Constitution of Pennsylvania, the plaintiffs have invoked no less than the six following provisions of our Constitution:

Article I, §3: "All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience, and no preference shall ever be given by law to any religious establishments or modes of worship."

Article III, §17: "No appropriation shall be made to any charitable or educational institution not under the absolute control of the Commonwealth, other than normal schools established by law for the professional training of teachers for the public schools of the State, except by a vote of two-thirds of all the members elected to each House."

Article III, §18: "No appropriation shall be made for charitable, educational or benevolent purposes to any person or community nor to any denominational and sectarian institution, corporation or association: Provided, That appropriations may be made for pensions or gratuities for military service and to blind persons twenty-one years of age and upwards, and for

assistance to mothers having dependent children and to aged persons without adequate means of support, and in the form of scholarship grants or loans for higher educational purposes to residents of the Commonwealth enrolled in institutions of higher learning, except that no scholarship grants or loans for higher educational purposes shall be given to persons enrolled in a theological seminary or school of theology."

Article IX, §7: "The General Assembly shall not authorize any county, city, borough, township or incorporated district to become a stockholder in any company, association or corporation, or to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual."

Article X, §1: "The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public schools, wherein all the children of this Commonwealth above the age of six years may be educated, and shall appropriate at least one million dollars each year for that purpose."

Article X, §2: "No money raised for the support of the public schools of the Commonwealth shall be appropriated to or used for the support of any sectarian schools."

A harmonious reading of these six provisions forces me to an observation which I deem crucial to the setting in which the plaintiffs' challenge must be considered: Although Article I, §3 and Article X, §2 clearly establish a wall of separation between the Commonwealth and religious institutions, the more recently adopted Article III, §18[1] seems to contemplate certain instances in which public money may properly be expended in the course of educational activities having a connection with church-related institutions. The last part of the proviso of Article III, §18, suggests to me

---

[1] Amendment of November 5, 1963.

state constitutional sanction for the payment of scholarship grants for higher education in those church-related institutions not teaching theology. I can see no other reasonable interpretation of Article III, §18's specific exclusion of theological schools and its silence on the matter of other programs conducted at institutions of higher learning.

That there are limits to the wall of separation erected by the Constitution of Pennsylvania is a conclusion which is not only required by constitutional language itself, but demanded by the practical realities of life in a modern interdependent community where there must of necessity be many points of contact between the agencies of government and all institutions, whether church-related or not. It is the inevitability of these points of contact which has undoubtedly permitted to exist, without significant successful challenge, the provision of many governmental services—fire, police, sewage—which in some sense benefit the conduct of religious institutions. Viewed in terms of hard realities, therefore, it is not the mere benefit to a religion which causes a service provided by government to violate our Constitution.

While provision of a general governmental service, which benefits a church-related institution, may not be for that reason alone unconstitutional, it is clear that for the constitutional language separating church and state to have the vital effect it was meant to have by its authors, there must be some areas and some services which government may not provide to religious institutions. The real difficulty is in gleaning from the sweeping phrases of our constitutional document the place where the line must be drawn.

The defendants in this case, as well as the opinion of the Court in the main rely upon the so-called child benefit theory to draw the line separating the constitutional from the unconstitutional. Given the presump-

tion in favor of the constitutionality of acts of the Legislature [2] and given this Court's duty to accept, unless palpably unreasonable,[3] the Legislature's view as to the reasonable relation of statutes to the public health, safety and welfare, I concur in the view that Act 91 is a safety measure whose object is the protection of children from road hazards. I also agree with the Court that such a conclusion is a crucial factor in determining the constitutionality of Act 91. It is my belief, however, that the constitutionality of legislation which benefits directly or indirectly a church-related institution may not be held constitutional merely because it is determined that the purpose or effect of the legislation is the welfare of children or, for that matter, any other proper object of legislative concern. Our Constitution's prohibition of any compelled support of a place of worship, maintenance of a ministry or preference of religion encompasses not only the proscription of financial aids to religion, but also any other governmental action creating special government approval of or involvement with religious activities.[4] And, the background of the Commonwealth's constitu-

---

[2] E.g., *Prichard v. Williston Township School Dist.*, 394 Pa. 489, 493, 147 A. 2d 380, 383 (1959). " 'An Act of Assembly will not be declared unconstitutional unless it *clearly, palpably* and *plainly* violates the Constitution,' " *Daly v. Hemphill*, 411 Pa. 263, 271, 191 A. 2d 835, 840 (1963) ; *Chartiers Valley Joint Schools v. Allegheny County Bd. of School Directors*, 418 Pa. 520, 546, 211 A. 2d 487, 501 (1965) ; *Milk Control Comm'n v. Battista*, 413 Pa. 652, 659, 198 A. 2d 840, 843, appeal dismissed, 379 U.S. 3, 85 S. Ct. 75 (1964).

[3] *Commonwealth v. Life Assur. Co. of Penna.*, 419 Pa. 370, 214 A. 2d 209 (1965), appeal dismissed, 384 U.S. 268, 86 S. Ct. 1476 (1966) ; *Loomis v. Philadelphia School Dist. Bd.*, 376 Pa. 428, 431-32, 103 A. 2d 769, 771 (1954).

[4] See *Gobitis v. Minersville School Dist.*, 21 F. Supp. 581, 584-86 (E.D. Pa. 1937), decree entered, 24 F. Supp. 271 (E.D. Pa. (1938) ), aff'd 108 F. 2d 683 (3d Cir. 1939), rev'd on other grounds, 310 U.S. 586, 60 S. Ct. 1010 (1940).

tional pronouncements on freedom of religion suggests strongly that prohibition of such aid to religion is, if anything, stricter than the proscription of financial aids.[5] Moreover, for such non-financial governmental involvement or approval to be constitutionally proscribed, a measure need not be as blatantly violative as a statute compelling weekly attendance at a house of worship. Far less overt forms of involvement and association would, in my view also be constitutionally void, and I can imagine measures which, though they arguably come within the child benefit theory, would bring government and religious institutions in such close association as to constitute, by virtue of implicit sanction of the government presence, the proscribed "support", "maintenance", and "preference".[6]

Thus what is ultimately persuasive to me in the instant case is not only that Act 91 is a welfare measure, but also the fact that the transportation of students is, in the phrase of *Everson*, "so separate and indisputably marked off"[7] from functions in any sense associated with religion. In other words, though I accept the conclusion that not only actual teaching of religion, but also the conduct of many other programs in parochial schools, is infused with religious significance, it seems to me clear that the process of transporting parochial students in a public bus is so devoid of any psychological, let alone religious, significance, that it does not bring the government into an association with the school which implies the approval or sanction proscribed by

---

[5] 21 Encyclopedia Americana 512-15 (1957 ed.) ; Buckalew, An Examination of the Constitution of Pennsylvania 5 (1883).

[6] Compare *Hysong v. Gallitzin Borough School Dist.*, 164 Pa. 629, 658-62, 30 Atl. 482, 484-86 (1894) (dissenting opinion). See also *Commonwealth v. Herr*, 229 Pa. 132, 78 Atl. 68 (1910) (per curiam).

[7] *Everson v. Board of Education*, 330 U.S. 1, 18, 67 S. Ct. 504, 512-13 (1947).

our Constitution. Indeed, the mere geographical distinctness of the facility being provided out of public funds and church-related institution underscores the lack of involvement of government with religion that Act 91 creates. The simple fact is that Act 91 does not even envision the use of a public facility within the confines of a religious institution; on the contrary, the language of Act 91 suggests that in many instances parochial school students will not even be carried to the doors of their schools.

Finally, I think it must be pointed out that the dissenting opinions are incorrect in their view that Act 91 is unconstitutional by virtue of its scheme of classification. It must be remembered that "courts may not question the wisdom of the legislative classification unless there can be found no reasonable ground for it"[8] and that "the reasonableness of the classification made is for the Legislature in the first instance."[9] The Legislature's exclusion of children attending schools operated for profit may have been motivated by a judgment that families of means sufficient to afford such schooling are not, like families of students attending nonprofit schooling, deterred by cost from ensuring that their children travel to and from school by a safe method of transportation. I fail to see why that would not be a basis for classification reasonable within this Court's above mentioned test. As to Mr. Chief Justice BELL'S contention that Act 91's exclusion of children attending schools operated for profit reveals it as solely intended to benefit sectarian education, the answer is simple: Act 91 includes not only children attending

---

[8] *Loomis v. Philadelphia School Dist. Bd.*, 376 Pa. 428, 432, 103 A. 2d 769, 771 (1954). See *Commonwealth v. Life Assur. Co. of Penna.*, 419 Pa. 370, 214 A. 2d 209 (1965), appeal dismissed, 384 U.S. 268, 86 S. Ct. 1476 (1966).

[9] *Loomis v. Philadelphia School Dist. Bd.*, supra note 8 at 431, 103 A. 2d at 771.

sectarian schools not operated for profit, but also children attending *non*-sectarian, *non-public* schools not operated for profit.

Mr. Justice Jones, Mr. Justice Eagen and Mr. Justice O'Brien join in this concurring opinion.

---

Dissenting Opinion by Mr. Chief Justice Bell:

Is the Act of June 15, 1965,* which amends §*1361,* of the Act of March 10, 1949,** known as the "Public School Code of 1949," Constitutional *under both the Constitution of the United States and the Constitution of Pennsylvania?* Each of the present actions sought to prohibit the defendant school district's expenditure of public funds for the purpose of furnishing free transportation to pupils attending Catholic and other *non-profit sectarian schools,* as authorized by the aforesaid amending Act of 1965.

Prior to the aforesaid 1965 amendment to the Public School Code, §1361 of the Public School Code provided only that "the Board of School Directors in any school district *may,* out of the funds of the district, *provide for the free transportation of any resident pupil to and from the public schools***. . .*"

The Act of 1965 pertinently provides: "The General Assembly of the Commonwealth of Pennsylvania hereby enacts as follows: Section 1. Section 1361, act of March 10, 1949 (P. L. 30), known as the 'Public School Code of 1949,' is amended to read:

"Section 1361. When provided

"The board of school directors in any school district may, out of the funds of the district, provide for the

---

* Act No. 91, P. L. 133, 24 P.S. §13-1361.

** P. L. 30, 24 P.S. §13-1361.

*** Italics throughout, ours, except where underlinings appear in a statute.

free transportation* of any resident pupil to and from
the public schools and to and from any points in the
Commonwealth *in order to provide tours* for any pur-
pose connected with the educational pursuits of the
pupils. When provision is made by a board of school
directors for the transportation of resident pupils to
and from the public schools, the board of school direc-
tors shall also make provision for the free transporta-
tion** of pupils who regularly attend nonpublic elemen-
tary and high schools not operated for profit. Such
transportation provided for pupils attending nonpublic
elementary and high schools not operated for profit
*shall be over established public school bus routes. Such
pupils shall be transported to and from the point or
points on such routes nearest or most convenient to the
school which such pupils attend. . ."*

In the Amendatory Act of 1965 the Legislature in
the clearest language *directed* boards of school direc-
tors (in any school districts in this Commonwealth) to
use (under certain circumstances) *public funds* for the
free transportation of pupils who regularly attend *non-
public* elementary and high *schools which are not op-
erated for profit**** whenever provision is made by such
a board for the transportation of resident pupils to and
from the public schools.

The essential averments in the complaints before us
are that pursuant to the Amending Act, a school dis-

---

* by school conveyances, private conveyances or electric rail-
ways or other common carriers. Section 1362.

** See also, "Section 2. The amendments made by this act shall
not be so construed as to limit or reduce in any way the payments
now made by the Commonwealth to various school districts to help
defray the cost of transporting pupils and the additional costs in-
curred by the boards of school directors in furnishing transporta-
tion under said amendments shall be included in the amounts for
which reimbursement may be received from the Commonwealth as
now provided by law."

*** with provisions and limitations not here pertinent.

trict has agreed to supply, or has appropriated tax money for the purpose of supplying, free transportation to pupils attending *nonprofit schools outside the public school system.* In the Worrell (Delaware County) action it is averred that such transportation will be supplied to pupils attending "sectarian" schools. In the Rhoades (Montgomery County) case, plaintiffs particularize. They aver that in the Abington Township School District there are five nonprofit schools owned and operated by the Roman Catholic Church, that these schools are *sectarian* and are parts of an independent school system maintained by such Church for the teaching and propagation of its particular faith, and that the furnishing of transportation to parochial school children is a necessary function in the operation of such schools.

Plaintiffs contend that the furnishing of free transportation by school districts to children attending sectarian schools constitutes a use of public funds to or is clearly for the benefit of sectarian schools and therefore violates (1) the First Amendment to the Federal Constitution and also (2)(a) Article I, §3, and (b) Article III, §18, and (c) Article X, §2, of the Constitution of Pennsylvania. They further contend that the *alleged* purpose of the Act, viz., protection of the health, safety and welfare* of children attending sec-

---

* The Pennsylvania Secretary of Public Welfare, Mr. Arlin M. Adams, testifying at the public hearings before the Senate Education Committee, said: ". . . *school bus* transportation clearly involves the *safety* and *health* of our children. The busing of school children is for their protection against hazards of the roadways and of traffic, against dangers occasioned by exposure to weather, against evils of child molestation. In 1963, there were 2.3 deaths per 100,000,000 miles, in cars, as compared with .2 death, per 100,000,000 miles, in school buses. With respect to injuries, a person is five times as safe in a school bus as in a car. With respect to death, a person is ten times as safe in a school bus as in a car." However, strange to say, *the Act did not require transportation*

tarian and nonprivate schools, *is unjustly discriminatory and is merely a sham and a subterfuge for financial aid to sectarian schools.* For example, *so far as health and safety* are concerned, (1) young children attending private schools are unprovided for, and **(2)** young children attending public schools and sectarian schools (a) who do not live near an established bus route or (b) who live within a mile and a half of the public or sectarian school they attend, are unprovided for, and (3) young children who have to cross hazardous city streets near their school in a large city are unprotected and unprovided for.

The principal defense raised by the school districts and also by the Commonwealth is that the "sole purpose and effect" of the 1965 Amendatory Act is to promote the safety, health and welfare of children attending nonpublic, nonprofit schools in the same manner as the safety, health and welfare of children presently attending public schools are promoted, *and a similar protection for children attending private schools is unnecessary and irrelevant.*

The Commonwealth further contends that the fact that the Act is *part of the Public School Code* is of no significance, and the public policy of the Commonwealth has utilized the Public School Code and funds

---

*by a bus,* although all the parties in their briefs discuss the issues on the basis that the transportation will be *by busing. Moreover,* neither Mr. Adams' testimony upon which the majority Opinion relies, nor the State of the Commonwealth Message delivered by the Governor of Pennsylvania (William W. Scranton) to the General Assembly, January 5, 1965, which recommended legislation to provide free bus transportation for children attending public and nonpublic schools in order to protect the health and safety of such children, upon which the Commonwealth and other parties rely, is admissible. *Bowers v. Pennsylvania Labor Relations Board,* 402 Pa. 542, 557-558, 167 A. 2d 480; *Henderson Estate,* 395 Pa. 215, 224, 149 A. 2d 892; *National Transit Co. v. Boardman,* 328 Pa. 450, 454, 197 Atl. 239.

of the school districts as the particular instrument and means for carrying on a wide variety of welfare, health and safety activities some of which have no realistic connection to the support of public schools.

Nearly all of the important facts and factors are agreed upon; the parties differ widely and vigorously upon (1) inferences and conclusions deduced or drawn from the facts, and (2) the correct meaning and interpretation of the pertinent provisions of the Federal and State Constitutions, and (3) the decisions of the Supreme Court of the United States.

## Does the Act Violate the Federal Constitution?

We start with the fundamental proposition that every Act is presumed to be both valid and Constitutional. *United States v. National Dairy Corporation,* 372 U.S. 29, 32; *Madden v. Kentucky,* 309 U.S. 83, 88; *Highland v. Russell Car and Snow Plow Co.,* 279 U.S. 253, 262; *Home Telephone Co. v. Los Angeles,* 211 U.S. 265, 281; *Sweet v. Rechel,* 159 U.S. 380. Cf. also *Goldblatt v. Hempstead,* 369 U.S. 590, 595-596; *United States v. Carolene Products Co.,* 304 U.S. 144, 152-154.

The First Amendment to the Constitution of the United States pertinently provides: "Congress shall make *no law respecting an establishment of religion,* or prohibiting the free exercise thereof; . . ."

Although this clause in the First Amendment clearly constitutes a "religious" restraint *only on Congress,* recent decisions of the Supreme Court hold that the Fourteenth Amendment has made the First Amendment a restraint upon the States as well as upon Congress. *School District of Abington Township v. Schempp,* 374 U.S. 203, and cases cited therein; *Murdock v. Pennsylvania,* 319 U.S. 105, 108; *Everson v. Board of Education,* 330 U.S. 1; *Illinois ex rel. McCollum v. Board of Education,* 333 U.S. 203, 210-211; *Zo-*

rach v. Clauson, 343 U.S. 306; McGowan v. Maryland, 366 U.S. 420; Torcaso v. Watkins, 367 U.S. 488; and Engel v. Vitale, 370 U.S. 421.

The short 15-word "Establishment" and "Free Exercise" clause of the First Amendment has generated many different and widely divergent views. To state the law in broad terms and generalities is easy, to particularize and to apply it is often difficult. Because of the great change in the life and habits and thoughts of the American people, and indeed of *education itself,* from the days of our "Framing Fathers," and because the questions and issues are often very close and overlapping or conflicting and at times filled with emotion, the net result has been the drawing of a line which is often thin and shadowy or elusive\* between the Constitutionally permissible and the Constitutionally impermissible.

So far as the "Establishment Clause" is concerned, I believe the present cases are ruled by the leading case of *Everson v. Board of Education,* 330 U.S.,\*\* supra, where the facts and issues are strikingly similar. A New Jersey statute authorized district boards of edu-

---

\* Mr. Justice Brennan, in a concurring Opinion, in *Abington School District v. Schempp,* 374 U.S., supra, said (pages 230, 231, 245): "The Court's historic duty to expound the meaning of the Constitution has encountered few issues more intricate [or more filled with emotion] or more demanding than that of the relationship between religion and the public schools. . . The fact is that the line which separates the secular from the sectarian in American life is *elusive.* The difficulty of defining the boundary with precision inheres in a paradox central to our scheme of liberty. . . . The case [*U.S. v. Ballard,* 322 U.S. 78, 95] shows *how elusive is the line* which enforces the Amendment's injunction of strict neutrality, while manifesting no official hostility toward religion. . ."

\*\* Mr. Justice Rutledge filed a lengthy dissenting Opinion in which three other Justices joined. Furthermore, Mr. Justice Douglas expressly stated in *Engel v. Vitale,* 370 U.S. 421, that after further thoughtful consideration he believed he and the rest of the majority in *Everson* were mistaken in their Opinion in that case.

cation to make contracts for the transportation of children to and from schools other than private schools operated for profit. A board of education by *resolution authorized the reimbursement of parents for fares paid for the transportation by public carrier of children* attending public *and Catholic schools.* The Catholic schools operated under the superintendency of a Catholic priest and, in addition to secular education, gave religious instruction in the Catholic Faith. A district taxpayer challenged the validity under the Federal Constitution of the statute and resolution, so far as they authorized reimbursement to parents for the transportation of children attending sectarian schools. Without deciding whether the exclusion of reimbursement to parents of children attending private schools operated for profit constituted a denial of the equal protection of the law, the Supreme Court sustained the Constitutionality of the Act and held:

1. The expenditure of tax-raised funds thus authorized was for a public purpose, and did not violate the due process clause of the Fourteenth Amendment; and

2. The statute and resolution did not violate the provision of the First Amendment which was made applicable to the states by the Fourteenth Amendment, prohibiting any "law respecting an establishment of religion."*

The Court, in *Everson v. Board of Education,* 330 U.S., pertinently said (pages 14, 16, 17) : "Their decisions, [the decisions of the State Courts] however, show the difficulty in drawing the line between tax legisla-

---

* The Court reviewed (a) the evils, the struggles and persecutions which had been going on abroad for centuries and from time to time in the Colonies between various religions, and religious faiths; and (b) the belief and reliance of our Colonists in God; and (c) the historical debates which induced the adoption of the First Amendment.

tion which provides funds for the welfare of the general public and that which is designed to support institutions which teach religion.

". . . New Jersey cannot consistently with the 'establishment of religion' clause of the First Amendment contribute tax-raised funds to the support of an institution which teaches the tenets and faith of any church. On the other hand, other language of the amendment commands that New Jersey cannot hamper its citizens in the free exercise of their own religion. Consequently, it cannot exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, because of their faith, or lack of it, from receiving the benefits of public welfare legislation. . .

"Measured by these standards, we cannot say that the *First Amendment* prohibits New Jersey from spending tax-raised funds to pay the bus fares of parochial school pupils as a part of a general program under which it pays the fares of pupils attending public *and other schools.*"

Plaintiffs present plausible arguments to support their contentions of unconstitutionality and argue, inter alia, (1) that *Everson,* 330 U.S., supra, is no longer the law because three of the five majority Justices in that case have died and another one has changed his views,* and (2) subsequent decisions of the Supreme Court have abandoned or changed some of the reasoning or statements upon which the majority relied in that case. See and compare, *Abington School Dist. v. Schempp,* 374 U.S., supra; *McGowan v. Maryland,* 366 U.S. 420; *Engel v. Vitale,* 370 U.S. 421, 442; *Sherbert v. Verner,* 374 U.S. 398, 410.

---

* I agree with the Court's decision, but it is this writer's opinion, which the dissenting Justices of the Supreme Court clearly emphasize in *Everson v. Board of Education,* 330 U.S., supra, that some of the analogies employed by the majority of the Supreme Court to support its opinion are neither relevant nor convincing.

In order to determine the contentions and the issues raised by the parties, we shall briefly analyze and review the subsequent cases which have been relied upon by one or more of the parties.

The Supreme Court in *Illinois ex rel. McCollum v. Board of Education,* 333 U.S. 203, struck down as *violative* of the First Amendment the teaching of religion in public school buildings by outside teachers supplied by various denominations under a "released time for children" arrangement between them and the Board of Education. Under this arrangement, the Board released the public school children for limited periods and allowed the use of its school buildings for the teaching of various denominational beliefs by *outside* religious teachers.

On the other hand the Supreme Court in *Zorach v. Clauson,* 343 U.S. 306, *held Constitutional* a "released time" program for the religious education of public school children *off the premises of such schools,* in which for brief periods the schools released children whose parents desired them to receive denominational education in their own Churches and Sunday Schools.

In *Engel v. Vitale,* 370 U.S. 421, 422, the Supreme Court declared *Un*constitutional a directive by the Board of Education to cause the following prayer to be said aloud by each class in the presence of a teacher at the beginning of each school day, *although no student was compelled to attend or to join in* the prayer over his or his parents' objection: "Almighty God, we acknowledge our dependence upon Thee, and we beg Thy blessings upon us, our parents, our teachers and our Country."

This decision to me is incomprehensible. Cf. also, *Illinois ex rel. McCollum v. Board of Education,* 333 U.S., supra.

On the other hand, *Everson v. Board of Education* has been followed and affirmed in *McGowan v. Mary-*

244

*land,* 366 U.S., supra, and in *Abington School District v. Schempp,* 374 U.S., supra. In *McGowan v. Maryland,* supra, where a divided Court in Opinions covering 162 pages analyzed and reviewed prior decisions and after quoting with approval (on pages 443-444) *Everson v. Board of Education,* held *Constitutional* a Maryland law which *generally* prohibited the sale on Sunday of all merchandise, although it contained many specific exceptions and limited the act to retailers in one county. The Court held, inter alia, that the purpose and effect of the statute was for the public welfare, i.e., not to aid religion, but to set aside a day of rest and recreation* for the public at large.

In *Abington School District v. Schempp,* 374 U.S., supra, the Court said (pages 205-222) : "Once again we are called upon to consider *the scope* of the provision of the First Amendment to the United States Constitution which declares that 'Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. . . .' These companion cases present the issues in the context of state action requiring that *schools begin each day with readings from the Bible.* While raising the basic questions under slightly different factual situations, the cases permit of joint treatment. In light of the history of the First Amendment and of our cases interpreting and applying its requirements, we hold that the practices at issue and the laws requiring them are *un*constitutional under the *Establishment Clause, as applied to the states through the Fourteenth Amendment.*

". . . The Commonwealth of Pennsylvania by law . . . requires that 'At least ten verses from the Holy

---

* The Court on page 437 referred to the long and intensive struggle for religious freedom in America as set forth in the Opinions in *Everson v. Board of Education,* 330 U.S., supra, and the historical position of Sunday closing laws as set forth in the same case.

Bible shall be read, without comment, at the opening of each public school on each school day. Any child shall be *excused* from such Bible reading, or attending such Bible reading, upon the written request of his parent or guardian.'

". . . Participation in the opening exercises, as directed by the statute is *voluntary*. . . .

"It is true that religion has been closely identified with our history and government. As we said in Engel v. Vitale, 370 U.S. 421, 434 (1962), 'The history of man is inseparable from the history of religion. . . .' The fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writings, from the Mayflower Compact to the Constitution itself. This background is evidenced today in our public life through the continuance in our oaths of office from the Presidency to the Alderman of the final supplication, 'So help me God.' Likewise each House of the Congress provides through its Chaplain an opening prayer, and the sessions of this Court are declared open by the crier in a short ceremony, the final phrase of which invokes the grace of God.* Again, there are such manifestations in our military forces, where those

---

* We may add that every daily session of the State Supreme Court and of every State Court in Pennsylvania is opened with a very brief ceremony which ends with the words "God save the Commonwealth and this Honorable Court." President Washington, President Lincoln, President Cleveland, President Wilson, President Roosevelt, President Eisenhower, President Kennedy, and nearly every President of the United States, have invoked in one or many of their speeches the aid of God. One of the lines of the Star-Spangled Banner is, "Then conquer we must when our cause it is just, and this be our motto 'In God Is Our Trust.'" Since 1865, the words "In God We Trust" have been impressed on our coins and imprinted on our paper money. The Pledge of Allegiance to the Flag contains the words "One Nation under God, indivisible, with liberty and justice for all."

of our citizens who are under the restrictions of military service wish to engage in voluntary worship. Indeed, only last year an official survey of the country indicated that 64% of our people have church membership, Bureau of Census, U. S. Department of Commerce, Statistical Abstract of the United States, 48 (83d ed. 1962), while less than 3% profess no religion whatever. Id., at p. 46. It can be truly said, therefore, that today, as in the beginning, our national life reflects a religious people who, in the words of Madison, are 'earnestly praying, as . . . in duty bound, that the Supreme Lawgiver of the Universe . . . guide them into every measure which may be worthy of his [blessing. . . .]'** . . .

"This freedom to worship was indispensable in a country whose people came from the four quarters of the earth and brought with them a diversity of religious opinion. Today authorities list 83 separate religious bodies, each with memberships exceeding 50,000, existing among our people, as well as innumerable smaller groups. . .

". . . [and then, most importantly, the Court said]

". . . The test may be stated as follows: *what are the purpose and the primary effect of the enactment?* If *either* is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause *there must be secular legislative purpose and a primary effect that neither advances nor inhibits religion.* Everson v. Board of Education, supra; McGowan v. Maryland, supra, at page 442."

---

** Notwithstanding these and even stronger religious sentiments expressed by the majority in the *Everson* case, I believe—as do the dissenting justices in that case—that what the Supreme Court avows about our religious beliefs and liberties, its conclusions and decisions too often disavow.

To summarize: notwithstanding the difficulty of reconciling all of the aforesaid cases, I believe that *Everson v. Board of Education,* 330 U.S., supra, and *Abington School District v. Schempp,* 374 U.S., supra, are still the law and require us to hold that the Amendatory Act of 1965 does not violate the First or Fourteenth Amendment of the Constitution of the United States.

## Does the Amendatory Act of 1965 Violate the Constitution of Pennsylvania?

Plaintiffs contend that the 1965 Amendatory Act violates Article I, §3, and Article III, §§7 and 18, and Article X, §2, of the Constitution of Pennsylvania.

The principle is well settled in Pennsylvania that an Act will be declared unconstitutional only if it "clearly, palpably and plainly" violates the Constitution: *Milk Control Commission v. Battista,* 413 Pa. 652, 659, 198 A. 2d 840; *Daly v. Hemphill,* 411 Pa. 263, 271, 191 A. 2d 835; *Dauphin Deposit Trust Co. v. Myers,* 388 Pa. 444, 450, 130 A. 2d 686, and *Evans v. W. Norriton Twp. Mun. Auth.,* 370 Pa. 150, 158, 87 A. 2d 474.

For many years, *Collins v. Kephart,* 271 Pa. 428, 117 Atl. 440, was considered the leading case in this field. In *Collins v. Kephart,* a bill in equity for an injunction was brought in five separate taxpayers' suits. The Court declared *Un*constitutional an appropriation to the Passavant Hospital of Pittsburgh and to St. Timothy's Memorial Hospital and to the Duquesne University of the Holy Ghost and to the Dubois Hospital Association and to the Jewish Hospital Association of Philadelphia. Each of these hospitals was a very worthy charity. Each contended that it was not a denominational or sectarian institution. Each of the hospitals admitted persons without regard to their religious faith and had nonsectarian directors and boards composed of

various denominations to conduct the hospitals and to take part in its management, and each proclaimed that it was not a sectarian or denominational institution. The Court held (a) that Article III, §18,* forbids State aid to all institutions affiliated with a particular religious sect or denomination, or which are under the control, domination or governing influence of any religious sect or denomination, and therefore, (b) the appropriations, even though they had been made without question or complaint for a period of 40 years, were *Un*constitutional. Chief Justice MOSCHZISKER, speaking for a unanimous Court said (pages 434-435): ". . . long persistence in a breach of the Constitution neither warrants the course pursued nor gives it legality: Kucker v. Sunlight, etc., Oil Co., 230 Pa. 528, 533.

"It is quite apparent that the creation of the so-called local board represents simply an effort to make the Passavant Hospital appear as though it were not a denominational institution, and thus enable it to obtain state aid; but that which cannot be done directly the law will not permit to be accomplished by indirection, for such a course, when tolerated by the courts, only serves to bring the law into contempt. The appropriation under attack, having in fact been made to a sectarian and denominational institution, cannot stand in law." (Pages 436-437)

". . . While all persons, without distinction of race, color or religion, are admitted to defendant hospital, yet there can be no doubt that it is a sectarian institution within the meaning of that term as used in the Constitution; therefore the appropriation to it fails in law." (Page 437)

. . .

"*We cannot but see that the arrangement before us is nothing more nor less than a plan to evade the Con-*

---

* Quoted hereinafter.

*stitution.* No doubt the plan was honestly conceived, in the belief that it was permissible and would prove effective; but this makes it none the less a *legal subterfuge.* The pruning knife of the law *eliminates all such devices, and lays bare the realities of the situation,* with which we must deal; these show the hospital named in the appropriation act to be under the control of a well known, much respected, religious order, and the state's money cannot be permitted to go through the agency of the hospital association to this sectarian institution, since it falls within the class to which that character of recognition is forbidden by the Constitution." (Pages 439-440)

. . .

". . . Those who adopted the restriction against appropriating money to sectarian institutions must change the rule, if desired, either through an amendment to the present Constitution or by making a new one; neither the legislature, acting alone, nor the courts have power so to do." (Page 441)

"The history of the development of social and political life in America shows a set purpose to divorce, absolutely, church and state: and this is the real underlying explanation of provisions like the one now before us, which appear, in one form or another, in the constitutions of many American commonwealths. *The intent* of these provisions was, and therefore still is, *to forbid the state from giving, either directly or indirectly,* any recognition to a religious sect or denomination, *even in the fields of public charity and education;* they in effect provide that, to serve charitable, educational or benevolent purposes, the money of the people shall not be put under denominational control or into sectarian hands, for administration or distribution, *no matter how worthy the end in view.*" (Page 432)

In other words, the Court held that the language, meaning and intent of this provision of the Constitu-

tion was clear and plain, *and no worthy objective would be allowed to circumvent or distort it or to give taxpayers' money directly or indirectly by evasion or circumvention or subterfuge to or for the benefit of a sectarian church, hospital or charitable institution, body, group, sect or denomination, even for very benevolent or important educational purposes.*

*Collins v. Kephart* has been cited several times with approval, and has never been overruled or distinguished.

In *Constitutional Defense League v. Waters,* 308 Pa. 150, 162 Atl. 216, which arose by a taxpayer's bill in equity seeking injunctive relief, this Court in a unanimous Opinion held that a charitable appropriation by the Legislature to a sectarian hospital was *Un*constitutional because it violated Article III, §18, of the Constitution of Pennsylvania. The Court quoted with approval excerpts from *Collins v. Kephart,* 271 Pa., supra. The case is well summarized in the following paragraph of the syllabus: "Article III, section 18, of our state Constitution, forbids state aid to institutions affiliated with a particular religious sect or denomination, or which are under the control, domination or governing influence of any religious sect or denomination."

In spite of the *Collins* and *Constitutional Defense League v. Waters* cases, supra, and *Snyder v. Newtown,* 147 Conn. 374, 161 A. 2d 770,* the Commonwealth con-

---

\* In the *Snyder* case, the highest Court in Connecticut held that a statute which authorized the town to transport at public expense children to non-profit private schools did not violate the Federal or the State Constitutional provisions respecting establishment of religion, but that insofar as it purported to make available for the transportation of pupils attending non-profit private schools money derived from school funds, it was *unconstitutional* under the State Constitution, in that the money had been inviolably appropriated to the support and encouragement of public or common schools. On appeal to the Supreme Court of the United States, 365 U.S. 299,

tends that the recent case of *Schade v. Allegheny County Inst. Dist.*, 386 Pa. 507, 126 A. 2d 911, sustains the constitutionality of the Amendatory Act of 1965. *Schade* is clearly distinguishable on its facts. *That case correctly decided* that payments by an institution district, or by any State Agency for the support, care and maintenance of delinquent, neglected or dependent children placed by the Juvenile Court in sectarian or denominational homes and institutions do not violate Article III, §18, of the Pennsylvania Constitution nor the due process clause of the Fourteenth Amendment. The Court pertinently said (pages 510-512) : "It was the plaintiffs' contention below, which the appellant renews here, that the payments made by the Institution District to the named denominational and sectarian institutions for the board, care and maintenance of dependent and neglected children committed thereto by the Juvenile Court of Allegheny County violated Article III, Section 18 of the Pennsylvania Constitution which provides that 'No appropriations shall be made for charitable, educational or benevolent purposes *to any person* or community *nor to any denominational and sectarian institution, corporation or association.*' The appellant also contends that such payments violate the due process clause of the *Fourteenth Amendment* of the Federal Constitution by effecting a deprivation of the liberty guaranteed by the First Amendment through the prohibition respecting 'an establishment of religion.' This question was not raised in the court below and got into the case solely by being dealt with by the dissenting chancellor upon the entry of the final decree by the court en banc.

"The opinion for the court [below] is based principally on the conclusion that the inhibition of Article III, Section 18 of the Constitution is directed solely

the Court handed down the following Opinion "Per Curiam": "The motion to dismiss is granted and the appeal is dismissed for want of a substantial Federal question."

against appropriations of State funds by the legislature and *does not apply to a governmental agency such as an Institution District.    With that, we are unable to agree. . . .* It would be strange, indeed, if the legislature by creating a body politic or corporate to exercise a legislative function could do indirectly what it may not do directly.   It seems too plain for cavil that, if a mere creature of the legislature can do what the legislature itself is constitutionally prohibited from doing, the carefully designed prohibition of Section 18 of Article III could readily be rendered useless.   Such a result is not to be sanctioned: Collins v. Kephart, 271 Pa. 428, 439, 117 A. 440.

"We, therefore, choose to bottom our decision on the ground that payments made by the Institution District for the support and maintenance of neglected or dependent children, who are under the jurisdiction and control of the Juvenile Court, *are not appropriations\** within the meaning of that term as employed in Section 18 of Article III. . . .

" 'The cost of the maintenance of neglected children either by the State or the County is neither a charity nor a benevolence, but *a governmental duty* [irrespective of the religion of a neglected child].   All the plaintiffs proved was that the monies received by the defendant institutions were in partial reimbursement for the cost of room and board of such minors\*\* . . . . A considerable part of this money is recouped by the Juvenile Court from the parents of these minor wards. The balance of the funds so expended are, *in legal effect,* payments to the child,—not the institution sup-

---

\* It must be remembered that appropriations can be made only from revenue obtained from taxes or borrowing.

\*\* Moreover, it is a matter of common knowledge that places for the commitment of neglected children are both insufficient in number and in many ways inadequate.

porting and maintaining him or her. [See Cochran v. Board of Education, 281 U.S. 370, 374-375]*** . . . ."

The Court then added by way of dictum (pages 512-513): "The appellant's further contention that such payments by the Institution District are in violation of the due process clause of the Fourteenth Amendment is equally unmeritorious. Inasmuch as this point was not raised in the court below nor there passed upon by the majority, we are not required to consider it here: Sherwood v. Elgart, 383 Pa. 110, 115, 117 A. 2d 899. We shall, however, point out the fallacy of the appellant's argument.

"As it has been held that the concept of liberty, as used in the due process clause of the Fourteenth Amendment, secures to the individual as against state action the same rights as are guaranteed against congressional action by the First Amendment (Cantwell v. Connecticut, 310 U.S. 296, 303; Murdock v. Pennsylvania, 319 U.S. 105, 108; Everson v. Board of Education, 330 U.S. 1, 15; and McCollum v. Board of Education, 333 U.S. 203, 211), the appellant argues that the Institution District's payments to the denominational or sectarian defendants *tend toward governmental 'establishment of religion'* and, consequently, are violative of the Fourteenth Amendment. . . . The Supreme Court has, in principle, settled it adversely to the appellant's position. See Everson v. Board of Education, supra, where it was held that a *State's use of public tax funds* for the transportation of pupils *to and from sectarian*

---

*** In *Cochran,* the Court held that an appropriation by the State of money derived from taxation to the supplying of school books free for school children is not objectionable under the Fourteenth Amendment as a taking of private property for private purposes where the books furnished for private schools are not granted to the schools themselves but only to or for the use of the children, and are the same as those furnished for public schools *and private schools* alike, and are not religious or sectarian in character.

*schools did not serve to promote the establishment of religion."*

We approve the decision in *Schade,* but not that part of its language which conflicts with and is irreconcilable with the Court's decision in *Collins v. Kephart,* 271 Pa., supra, which it cites with approval.

*Furthermore, we must consider not only Article III, §18, but also Article III, §7, and Article X, §§1 and 2, of our Constitution, which were not involved or discussed in the Schade case.* All of these Articles must be considered together in discussing and determining the issues in this case, i.e., whether the Amendatory Act of 1965, which amends the Public School Code, violates these or any other provisions of the Constitution of Pennsylvania.

Article III, §7, of the Constitution of Pennsylvania prohibits the General Assembly from passing any local or special law "regulating the affairs of . . . school districts, [*or*] *granting to any . . . individual any special or exclusive privilege. . . ."*

Article X, §1, provides: "The General Assembly shall provide for *the maintenance and support* of a thorough and efficient system *of public schools,* wherein all the children of this Commonwealth above the age of six years may be educated, . . ."

Article X, §2, provides as follows:

*"Section 2. No money raised for the support of the public schools of the Commonwealth shall be* appropriated to or *used for the support of any sectarian school."*

It will be instantly observed that the language of the Pennsylvania Constitution differs greatly from the pertinent language of the First Amendment of the Constitution of the United States, which pertinently merely prohibits any "law respecting an establishment of religion." The Constitution of Pennsylvania clearly and expressly mandates a public school system for

Pennsylvania school children, and (a) clearly and expressly prohibits appropriations to or *use of public money for the support of any sectarian school* and (b) in Article III, §18, provides: "No appropriation shall be made for charitable, *educational or benevolent purposes to any person* or community nor to any denominational or sectarian institution. . ."* Considering all the aforesaid Articles together, as of course we should, it is crystal clear that no money raised by the Commonwealth or by any of its agencies or by any governmental institution can be used for the support of any sectarian school, or used to grant any special privilege to the children who attend it, no matter how worthy and benevolent that sectarian school or institution is, and no matter how beneficial these grants to the children or their parents would be.

The raising of money by taxes or by borrowing or the expenditure of public funds to provide transportation *not for all* school children in Pennsylvania *but only for children who attend public or sectarian schools* which are not operated for profit, clearly violates the spirit, the meaning and the intent of the aforesaid provisions of the Pennsylvania Constitution, and, we believe, the language thereof. These Constitutional provisions are of such tremendous importance to *all* the people of Pennsylvania that no circumvention, dilution or distortion should be allowed to evade or nullify or make a mockery of them. The 1965 Amendatory Act undoubtedly benefits healthwise and safetywise a *restricted class* of school children, as well as sectarian schools. If it is both reasonable and necessary to protect the safety and health of public school children and sectarian school children by the State's use of public or

---

* With certain provisions, grants and exceptions not here pertinent.

institutional tax funds for their transportation to school, how can it be reasonable and legal and Constitutional, and not arbitrary and discriminatory, to exclude private school children from the benefits of these health and safety measures?*

The title of the 1965 Act states that its purpose is to provide "for the health, welfare and safety of the children of the Commonwealth", and yet in the very same breath excludes those children who attend schools which are operated for profit. The fact that the so-called School Busing law or its 1965 amendment does not provide for the transportation of *all* school children, regardless of the kind of school they attend, demonstrates that the *real "purpose and the primary effect"* of the Act of 1965 was to benefit and protect the health and safety of only sectarian school children (as well as, indirectly, their schools), *rather than to provide for and protect the health and safety of all the school children of Pennsylvania.*

To express it in other words, if this *1965 Act* is, as its proponents contend, really for the protection of the health and safety—*not of all* school children but only— of *sectarian* school children, by providing public funds for the protection of the health and safety of *this special class* of school children, i.e., parochial or sectarian school children, then it is unreasonable, arbitrary and

---

\* We further note that under §1362 of the Public School Code, free transportation of resident pupils of public and sectarian schools may be provided out of the funds of the school district, but such transportation (1) shall be over established public school bus routes and not nearer a school than a mile and a half, and (2) may be furnished by using either school conveyances, private conveyances, or electric railways or other common carriers. What happens or may happen to the safety and health of all those school children (1) (a) who live far from an established bus route station, or (b) within a mile and a half of the public or sectarian school they attend; and (2) those children who attend a private school?

invidiously, discriminatory, and such an obviously patent device to circumvent and nullify the Constitution as to be clearly and beyond any doubt Unconstitutional.

## Legislative Classification

We may add that there is another barrier which the majority does not even discuss. Legislative classifications are permitted in Pennsylvania and are Constitutional, provided they are not unreasonable and arbitrary and have a reasonable basis for the distinctions and classifications they make. We all agree that the wisdom or lack of wisdom of an Act is a matter for the Legislature and not for the Courts, and that classifications and distinctions will be sustained provided they are "reasonable and founded upon a genuine distinction."

The law is well expressed in *Kurtz v. Pittsburgh,* 346 Pa. 362, 31 A. 2d 257, where the Court held *unconstitutional,* as being in plain contravention of Article III, §7, the Act of June 7, 1917, as amended. That Act provided for the payment to dependent wives of public employees in the armed forces of the United States of a specified portion of their salary. In a lengthy 24-page Opinion, the Court analyzed and reviewed many of the cases involving the question of a violation of Article III, §7, of the Pennsylvania Constitution,* and pertinently said (pp. 367, 368, 369) : "Class legislation has frequently been declared void by this Court, and what *is*** class legislation has been defined and illustrated in a long line of decisions. In Penna. Co. for Insurances on Lives and Granting Annuities et al., Ap-

---

* For a more recent analysis and review of many decisions of this Court and of the Supreme Court of the United States, see the dissenting Opinion in *Bargain City U.S.A. v. Dilworth,* 407 Pa. 135-142.

** Italics in *Kurtz* Opinion.

pellants, v. Scott, Prothonotary et al., 329 Pa. 534, 198 A. 115, this Court in an Opinion by Mr. Justice LINN quoted what was said in Laplacca et ux. v. Phila. Rapid Transit Co., 265 Pa. 304, 108 A. 612, as follows: *'The basis for classification must be reasonable and proper and founded upon a real, and not merely artificial, distinction* between the members of the class and the general public, and based upon "a necessity springing from manifest peculiarities, clearly distinguishing those of one class from each of the other classes, *and imperatively demanding legislation for each class, separately, that would be useless and detrimental to the others"* '.

". . . In Ayars' Appeal, 122 Pa. 266, 16 A. 356, Justice STERRETT said: 'The underlying principle of all the cases is that classification . . . is essentially unconstitutional, unless a necessity therefor exists [a necessity springing from manifest peculiarities, clearly distinguishing those of one class from each of the other classes and imperatively demanding legislation for each class separately, that would be useless and detrimental to the others] . . .' This principle was applied in Commonwealth ex rel. Brown v. Gumbert et al., 256 Pa. 531 [534], 100 A. 990. Although the legislation under attack there was 'humanitarian', we said that a 'positive constitutional requirement' cannot be disregarded because of an act's 'beneficent aim.'

". . . arbitrary selection can never be justified by calling it classification. . ."

See also *Davis v. Sulcowe,* 81 Dauphin 72 (1963), wherein it was held that there was no basis for distinguishing between nonprofit nursing homes and proprietary nursing homes for minimum wage requirement purposes.

Because the 1965 Amendatory Act has such an important and beneficial purpose and objective, it is with great regret that I feel I must dissent and hold that the Amendatory Act of 1965, with its arbitrary and un-

reasonable distinctions and classifications—which do not imperatively demand safety and health protection for sectarian school children *which would be useless and detrimental to private school children*—is clearly and plainly unconstitutional.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

The act in question violates, in my opinion, both the Pennsylvania Constitution and the Federal Constitution, and is further void for vagueness and incompleteness. Moreover, it is premised upon the subterfuge of the "child benefit" theory, and the present case comes before us with a record insufficient to substantiate the arguments made in support of the statute.

Article X, §§1 and 2 of the Pennsylvania Constitution provide: "§1. Public school system. The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public schools, wherein all the children of this Commonwealth above the age of six years may be educated, and shall appropriate at least one million dollars each year for that purpose.

"§2. Diversion of school moneys to sectarian schools. No money raised for the support of the public schools of the Commonwealth shall be appropriated to or used for the support of any sectarian school."

Section 1 is a mandate to the legislature to maintain and support a system of public schools. Section 2 is a prohibition against the diversion of public school tax moneys to or for the support of sectarian schools. As I view the matter, in a society which tends to increase the size of schools and to erect them ever further from the homes of the students, the provision of transportation to and from school has become an integral function of the educational system and is a direct aid thereto. Accordingly, where the school system is sectarian, the provision of tax supported transportation for the

purpose of affording a daily pilgrimage to a place offering religious training is an appropriation to a sectarian institution in violation of Article 10, §2 of the Constitution of this Commonwealth.

Regarding the First Amendment argument, I recognize the apparent binding effect of *Everson v. Board of Education,* 330 U.S. 1 (1947). However, I believe that certain more recent statements of the Supreme Court have to a great extent diminished the force and impact formerly enjoyed by *Everson.* In *Illinois ex rel. McCollum v. Board of Education,* 333 U.S. 203 (1948), the Court held that a "released time" arrangement whereby pupils were permitted to receive religious instruction in public school buildings during regular school hours was in violation of the First Amendment principle of separation of church and state; in *Torcaso v. Watkins,* 367 U.S. 488 (1961), the Court held that the requirement of the Maryland Constitution that every office holder must declare a belief in the existence of God violated the First Amendment as an invasion of the individual's freedom of belief and religion; in *Engel v. Vitale,* 370 U.S. 421 (1962), the Court held that the use of the public school system to encourage recitation of a brief non-denominational prayer was inconsistent with the establishment clause; and in *Abington School District v. Schempp,* 374 U.S. 203 (1963), the Court held that school exercises requiring the reading of Bible verses or the Lord's Prayer violated the establishment clause. Especially significant is the fact that one of the critics of *Everson* is Justice DOUGLAS, who was among the five majority justices in *Everson* but who in *Engel* stated in a concurring opinion that' as he reconsidered the decision in *Everson,* it was inconsistent with the First Amendment and that the dissenting opinion of Justice RUTLEDGE in *Everson* was better law. I should like the United States Supreme Court finally to decide this case so that they may re-

consider the *Everson* doctrine. Accordingly, I would appoint a master in each case with instructions that a record be made upon which both this Court and the United States Supreme Court might more meaningfully reach a decision.

The act in question is further void inasmuch as it is vague and incomplete. The statute authorizes busing "over established public school bus routes" and requires nonpublic school pupils to be transported to and from "the point or points on such routes nearest or most convenient to the [nonpublic] school which such pupils attend." The Attorney General, apparently realizing that as enacted the statute remained too vague to be implemented, outlined in a letter to the Acting Superintendent of Public Instruction several guidelines for the implementation of the act. In it the Attorney General declared that a school board may make deviations from established routes, may make *new* routes and *re-routes,* and may reestablish routes in order to accommodate nonpublic school children. In addition, he defined as part of the established public school bus route any distance which a school bus is required to travel beyond a public school in order to complete its trip or reach its place of storage. In effect, the Attorney General assumed the role of an overseer of the legislature and rather than *interpret* the act, saw fit to write his own version simply because the statute passed by the General Assembly was incomplete and unworkable. Neither the Attorney General nor the Courts may write legislation for the General Assembly, and when that body has failed to include certain essential requirements in an enactment, neither the executive nor the judiciary may under the guise of interpretation add the missing requirements. *Altieri v. Allentown Officers' and Employees' Retirement Board,* 368 Pa. 176, 81 A. 2d 884 (1951); *Akins v. York Officers' and Employees' Retirement Board,* 368 Pa. 182, 81 A. 2d 883 (1951); Note,

The Void-for-Vagueness Doctrine, 109 U. Pa. L. Rev. 67 (1960).

Finally, on the record (or lack of one) before us, I am unable to conclude that this statute may be sustained by virtue of the "child benefit" theory. It is obvious that that theory is merely a subterfuge by which its supporters justify the enactment in question. For one thing, the act does not provide free transportation for all pupils. It excludes from the enjoyment of its benefits students who attend private schools operated for profit. I can see no basis for omission of these children if the statute was truly enacted for the safety and welfare of the children of our Commonwealth. The reason is clear, however, because an examination of the statute indicates that safety was not the predominant motive for its passage. The act, as passed, will actually *increase* the danger to children who formerly were transported from their homes to the private or parochial schools in privately operated buses. The act provides for transportation of such pupils to and from points on established school bus routes "nearest or most convenient to the [nonpublic] school. . . ." This statute completely ignores the additional hazards that imperil these children, and cannot be sustained by reference to a makeshift "child welfare" theory. The only way this provision can truly serve the welfare of the children of the Commonwealth is that it be implemented by providing to the nonpublic school children the same service accorded to those that attend public school. That means taking them to and bringing them from their schools and by so doing, clearly violating the Pennsylvania and Federal Constitutions. As I have indicated, bus transportation has become an integral part of the process of education and any improvement in the transportation of pupils must be considered as an aid to the schools. In fact, the statute in question, in addition to the provisions herein considered, pro-

vides for free transportation of public school pupils for tours "connected with the educational pursuits of the pupils." The act was passed as an aid to education and that is all. Since it grants tax supported benefits to sectarian educational institutions it is unconstitutional. That is all there is to it.

I dissent.